

**FILED**

Jun 05 2017, 2:43 pm

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR PETITIONER

Joshua C. Neal
William A. Ramsey
Barrett McNagny LLP
Fort Wayne, Indiana

ATTORNEYS FOR RESPONDENT

Curtis T. Hill, Jr.
Attorney General of Indiana

Winston Lin
Jessica R. Gastineau
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# INDIANA TAX COURT

Evansville Courier
Company Inc.,

*Petitioner,*

v.

Vanderburgh County Assessor,

*Respondent*

June 5, 2017

Tax Court Case No.
02T10-1611-TA-55

On Appeal from a Final
Determination of The Indiana
Board of Tax Review

**Baker, Special Judge.**

Evansville Courier Company, Inc. (Evansville Courier), seeks judicial review of the decision of the Indiana Board of Tax Review (the Board) denying Evansville Courier's claimed tax deductions for the abnormal obsolescence of a printing press and related equipment. The Court finds that the Board improperly admitted an untimely-disclosed exhibit offered by the Vanderburgh County Assessor (the County) and that the Board did not err by finding that Evansville Courier did not make a prima facie case of abnormal obsolescence. We find that the Board erred by admitting the untimely exhibit. We also find, however, that the Board did not err by denying Evansville Courier's petition, and affirm the Board's judgment.

## Facts[1]

Evansville Courier is a daily newspaper publisher located in Evansville. Its primary paper, the *Evansville Courier & Press*, is published seven days per week. Over the last decade or so, Evansville Courier has experienced the downturn of the newspaper industry. In 2004, it employed approximately 500 people; currently, it employs approximately 215 people. In 2011, on average, it sold 49,126 newspapers from Monday through Saturday, with an average Sunday circulation of 70,864 newspapers. By 2014, the average circulation decreased to 39,999 newspapers during the week and to 57,111 on Sundays. It has

---

[1] The Court held oral argument in this case in Fort Wayne on May 31, 2017. We thank Judge Surbeck and his staff for their warm hospitality, and we thank counsel for both parties for their excellent written and oral presentations.

experienced an overall decline of nearly 60% in circulation since the 1990s. Evansville Courier anticipates that it will soon reduce the number of publication days for the *Evansville Courier & Press* and that at some point in the next ten years, it will stop printing newspapers altogether.

[3] In 1989, Evansville Courier purchased a new 12-position flexographic printer (the Printing Press). At that time, the flexographic method of printing was expected to become the predominant method of printing newspapers, but within a few years, it became apparent that the industry preferred using an offset press rather than a flexographic press. At one time, there were as many as thirty newspaper companies nationwide using flexographic press printers, but now only twelve remain in use. The flexographic method of printing is more expensive than the alternative offset method. Additionally, Evansville Courier can no longer buy parts for the Printing Press from the manufacturer, meaning that it must have parts specially manufactured or purchase used parts from newspaper companies that once operated similar presses.

[4] In July 2011, Evansville Courier filed its 2011 tax return. The 2011 Return included a separate schedule applying an abnormal obsolescence deduction to the Printing Press and related equipment. Evansville Courier filed similar returns for each of the 2013 and 2014 tax years. In sum, Evansville Courier requested the following approximate abnormal obsolescence adjustments: $649,398 for 2011; $3.5 million for 2013; and $5.1 million for 2014. The abnormal obsolescence adjustments were disallowed by Vanderburgh County for each of the three years.

The parties went through the required administrative process for each of the three tax returns.

- In March 2011, the Vanderburgh County Assessor had assessed the value of Evansville Courier's personal property, including the Printing Press and related equipment, to be approximately $8.6 million. Appellant's App. p. 4. Evansville Courier appealed that determination to the Vanderburgh County Property Tax Assessment Board of Appeals (the Vanderburgh County Board). Following an October 7, 2011, hearing, the Vanderburgh County Board affirmed the assessment of Evansville Courier's personal property value to be approximately $8.6 million. *Id.* at 7-8. On December 5, 2011, Evansville Courier filed a petition with the Board seeking a review of the Vanderburgh County Board's decision, asking that its property be valued at approximately $7.4 million. *Id.* at 1-3.

- In March 2013, the Vanderburgh County Assessor assessed the value of Evansville Courier's personal property to be approximately $8.57 million. *Id.* at 31. Evansville Courier appealed that determination to the Vanderburgh County Board, which, following a September 23, 2013, hearing, affirmed the assessment of the personal property value to be approximately $8.57 million. *Id.* at 35. On November 8, 2013, Evansville Courier filed a petition with the Board seeking a review of the Vanderburgh County Board's decision, asking that its property be valued at approximately $5 million. *Id.* at 22-24.

- In March 2014, the Vanderburgh County Assessor assessed the value of Evansville Courier's personal property to be approximately $7.6 million. *Id.* at 49. Evansville Courier appealed that determination to the Vanderburgh County Board, which, following a January 9, 2015, hearing, affirmed the assessor's valuation. *Id.* at 48. On March 30, 2015, Evansville Courier filed a petition with the Board seeking a review of the Vanderburgh County Board's decision, asking that its property be valued at approximately $2.5 million. *Id.* at 42-44.

On January 26, 2016, the Board held a combined evidentiary hearing on each of Evansville Courier's three pending petitions.

[6] At the hearing, Evansville Courier submitted appraisals prepared by Brad Venisnik, an Accredited Senior Appraiser, in support of its claim for an abnormal obsolescence deduction for the Printing Press and related equipment for the years of 2011, 2013, and 2014. The appraisals were prepared in accordance with the Uniform Standards of Professional Appraisal Practice. Venisnik considered the cost, income, and market approaches to value. He relied most heavily on the market approach because that approach "most accurately quantifies all forms of depreciation and obsolescence." *Id.* at 505. Venisnik researched the market by talking with the original equipment manufacturer, used equipment dealers, and other operators of two presses that are similar to the Printing Press.

[7] Venisnik's research indicated that (a) the original equipment manufacturer would attach a value of $865,000 to the Printing Press for the 2011 tax year; (b) no used equipment dealer had any interest in purchasing the Printing Press or any indications of recent comparable sales; and (c) other newspaper companies have discontinued operations of their flexographic presses and have sold the component parts for their scrap value. Venisnik concluded that it would be impractical to use the Printing Press for anything other than printing newspapers and that it lacks functionality for its best use because of an inherent inability to print color copy on both sides of the page. He therefore determined that it is not possible to cure the causes of the Printing Press's obsolescence.

Based on his research, Venisnik placed a value on the Printing Press and related equipment for 2011 of $1.2 million. He calculated abnormal obsolescence by using a mathematical computation equal to the difference between the reportable value of the Printing Press and its equipment and the appraised value. For 2011, the amount of abnormal obsolescence was approximately $4.3 million. For 2013 and 2014, the appraised value of the Printing Press and related equipment was $820,000 and $632,000, respectively. Thus, the amount of abnormal obsolescence for each of these years was approximately $4.44 million for 2013 and $4.47 million for 2014.

As part of its case-in-chief, Vanderburgh County called Bill Fluty, the County assessor, to testify. During Fluty's testimony, the County offered into evidence an evaluation of Venisnik's market value appraisal of the property in 2014. Evansville Courier objected to this exhibit because it had not been provided to Evansville Courier five days before the hearing as required by the Indiana Administrative Code and because it was hearsay evidence. The County responded that the exhibit was rebuttal testimony and therefore did not have to comply with the five-day timeline. The Board took the issue under advisement and completed the hearing.

On September 19, 2016, the Board issued its final determination, which denied Evansville Courier's petitions. In relevant part, the Board found and held as follows:

> 16. [With respect to the exhibit that was not timely disclosed by the County,] [w]hile the Board's procedural rules do not

specifically exempt rebuttal evidence from the exchange requirements, the Board does recognize a general exception for rebuttal evidence. . . . The Board may exclude evidence offered as rebuttal that should have been presented in the party's case-in-chief, but is not required to do so. Here, the Board is willing to make an exception because the exhibit was specifically offered to challenge the validity of the Petitioner's appraisals. . . . Hence, the Petitioner's objection is overruled as it pertains to the pre-hearing disclosure requirement.

*** 

18.     Respondent's Exhibit 4 is hearsay, and the Respondent failed to point to any recognized hearsay exception. However, it does nothing to either prove or disprove the property's market value-in-use. As such, the exhibit is admitted. Because the Petitioner objected to the exhibit, it cannot serve as the sole basis for the Board's decision. The Board notes however, the decision to allow Respondent's Exhibit 4 does not affect the final determination.

*** 

72.     Here, the Petitioner is making a claim of "abnormal obsolescence." The argument was made that "unforeseen changes in market value have caused the subject property to suffer from abnormal obsolescence." These alleged unforeseen changes include increased competition from various news sources, widespread access to the internet, the delivery of news through various social media outlets, and online advertising that negatively affects advertising revenue.

73.     The Petitioner's press is 25 years old. It is reasonable to conclude that significant technological changes can, and will, occur over that time span. Examples of such changes include the

virtual disappearance of items such as Beta videocassette recorders, cassette audiotapes, and typewriters. The invention of a newer, more productive piece of equipment capable of producing a better quality item does not necessarily mean an older, currently utilized item should be considered abnormally obsolete.

74. No argument was made that the subject property is not capable of, or is not currently, performing the very task for which it was purchased. In fact, the press is still utilized daily. Further, just because other forms of "media" have become more prevalent, that does not necessarily qualify the items for "abnormal obsolescence." As the Board has previously held, common events in the nature of business, such as increased competition, do not amount to abnormal obsolescence.

75. Additionally: in order to qualify for "abnormal obsolescence," the obsolescence must be of a "non-recurring nature." The Board has heard previous appeals that offer guidance on the issue of "non-recurring nature." *See Jofco, Inc. v. Bainbridge Township Ass'r, et al*, Pet. No. 19-018-04-1-7-00006 (Ind. Bd. Tax Rev. December 28, 2005); and *Kimball Int'l, Inc. v. Bainbridge Twp. Ass'r*, Pet. Nos.19-018-04-1-7-00007, 19-018-04-1-7-00008, and 19-018-04-1-7-00009 (Ind. Bd. Tax Rev. December 30, 2005); see also Ind. Code § 4.2-9-3(a).

76. The petitioners in *Jofco* and *Kimball* engaged in business dealings in New York and Washington. Both suffered a substantial decline in business, roughly 35% to 40%, following the "unexpected and unforeseen" terrorist attacks that occurred on September 11, 2001, in New York City and elsewhere. The Board agreed that, based upon a fact sensitive inquiry, the Petitioners qualified for an "abnormal obsolescence" deduction. Here, the Petitioner failed to point to a single, specific, non-recurring triggering event that would justify a determination of "abnormal obsolescence." Further, the Petitioner failed to

present any evidence its losses were remotely comparable to those suffered by the Petitioners in *Jofco* and *Kimball*.

77. The Petitioner failed to show that the property under appeal suffered from "abnormal obsolescence." . . .

78. Even if the Board were to find the subject property has some degree of "abnormal obsolescence" the claim would still fail. The Petitioner's appraiser failed to provide sufficient probative evidence that the cause for "abnormal obsolescence" resulted in a quantifiable loss in value. Instead of utilizing the appropriate method of calculating the assessment, the Petitioner's appraiser chose to use the "market approach." Methods of assessing personal property are substantially different from those used to assess real property, as previously explained. Further, even if Mr. Venisnik's approach to value had been appropriate, his appraisal does not provide a reliable market value for the property under appeal.

79. The sales comparison approach, or as Mr. Venisnik referred to it "the market approach," requires gathering sufficient data on recently sold assets that are similar to the subject property, analyzing the value characteristics of those comparable assets, comparing the characteristics to those of the subject property and making appropriate adjustments for differences. It is difficult to see how Mr. Venisnik could have appropriately utilized this methodology when, according to his own testimony, there is "not an active market for the flexographic press." Mr. Venisnik was unable to cite any "actual sale" of a flexographic press. Instead, he relied on "conversations" with the original equipment manufacturer, used equipment dealers, and other operators of flexographic presses. No probative evidence was presented that would persuade the Board that these individuals are able to establish a reliable value for a flexographic printing press. Further, Mr. Venisnik failed to show that "conversations"

regarding "opinions" of value followed generally accepted appraisal practices.

80. With regard to the Petitioner's argument stating it was "negatively impacted" by the decision to purchase a flexographic press rather than an offset press, this argument falls short. Presumably, a reasonably prudent purchaser of a multi-million dollar piece of equipment would be aware of the risks in purchasing equipment. The Petitioner acknowledges it was a "bad business decision." But bad business decisions do not justify a finding of "abnormal obsolescence."

81. The Petitioner failed to establish a prima facie case for reducing the assessed value of its personal property. Where a Petitioner has not supported its claim with probative evidence, the Respondent's duty to support the assessment with substantial evidence is not triggered.

Appellant's App. p. 86-108 (some internal citations omitted). Evansville Courier now seeks judicial review of the Board's decision.

# Discussion and Decision

## I. Standard of Review

The Court gives great deference to decisions made by the Board when it acts within its authority. *Hamilton Cty. Assessor v. Duke*, 69 N.E.3d 567, 569 (Ind. Tax Ct. 2017). Accordingly, the Court will reverse only if the Board's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, privilege, or immunity; in excess or short of statutory jurisdiction, authority, or limitations; without observance of

procedure required by law; or unsupported by substantial or reliable evidence. Ind. Code § 33-26-6-6(e). The party challenging the Board's decision bears the burden of demonstrating its invalidity. *Hamilton Cty.*, 69 N.E.3d at 569.

[12] The Court defers to the Board's factual findings, but only if they are supported by substantial evidence. *6787 Steelworkers Hall, Inc. v. Scott*, 933 N.E.2d 591, 595 (Ind. Tax Ct. 2010). Evidence is substantial "'if it is more than a scintilla and less than a preponderance or if it would be accepted as adequate to support a conclusion by a reasonable mind.'" *Id.* at 595 n.7 (quoting *French Lick Twp. Tr. Assessor v. Kimball Int'l, Inc.*, 865 N.E.2d 732, 739-40 n.14 (Ind. Tax Ct. 2007)). The Court applies a de novo standard of review to the Board's legal conclusions. *6787 Steelworkers*, 933 N.E.2d at 595. In conducting the review, the Court will neither reweigh evidence nor assess witness credibility. *Id.*

## II. Untimely Submission of Exhibit

[13] Evansville Courier first argues that the Board erred by admitting into evidence a document submitted by the County that was not provided to Evansville Courier according to the requisite timeline.

[14] The Indiana Administrative Code mandates that a party to an administrative appeal before the Board "*must* provide" copies of documentary evidence to all other parties at least five business days before the hearing. 52 Ind. Admin. Code 2-7-1(b)(1) (emphasis added). Failure to comply with this rule "may serve as grounds to exclude the evidence[.]" 52 I.A.C. 2-7-1(b)(f). This Court has explained as a general matter that the purpose of the discovery rules is "to allow

a free exchange of fact information and to permit each party to prepare its case for trial without concerns about trial by surprise or ambush." *Brandenburg Indus. Serv. Co. v. Ind. Dep't of State Revenue*, 26 N.E.3d 147, 152 (Ind. Tax Ct. 2015). And indeed, our Supreme Court has unequivocally and "consistently rejected a 'gaming view' of the litigation process." *Outback Steakhouse of Fl., Inc. v. Markley*, 856 N.E.2d 65, 75 (Ind. 2006).

It is undisputed that the County failed to provide a copy of its exhibit criticizing Venisnik's appraisal at least five business days before the hearing. The County argued, and the Board ultimately held, that because the evidence was rebuttal evidence, its disclosure was not required.

The Court disagrees. It is well established that "the nondisclosure of a rebuttal witness is excused *only* when that witness was unknown and unanticipated; known and anticipated witnesses, even if presented in rebuttal, must be identified pursuant to a court order, such as a pre-trial order, or to a proper discovery request." *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 179 (Ind. 1993) (emphasis added). Here, the County was well aware of the nature of Venisnik's testimony and arrived at the hearing armed with evidence to rebut that testimony. The exhibit in question was dated January 20, 2016, and the hearing occurred on January 26, 2016, meaning that this exhibit was known, anticipated, and actually available to be disclosed to Evansville Courier within the requisite timeline. Appellant's App. p. 774-90. The County's failure to do so constitutes precisely the type of "gotcha" litigation that Indiana courts abhor. Under these circumstances, the admission of this exhibit was erroneous.

# III. Abnormal Obsolescence

## A. General Principles

Generally, all property located in the State of Indiana is required to be taxed as either personal or real property. 50 Ind. Admin. Code 4.2-1-3. With respect to personal property, a tax return must be filed in each taxing district where property has a tax situs subject to certain qualifications. 50 I.A.C. 4.2-4-2(a).

Taxpayers must record the cost of depreciable property, both real and personal, and use that cost in determining the value of the depreciable personal property subject to assessment. *Id.* Ordinary depreciation of personal property is calculated pursuant to a set schedule contained in the Indiana Administrative Code. This schedule automatically reflects all adjustments for Indiana property tax purposes except for abnormal obsolescence. 50 I.A.C. 4.2-4-8. Consequently, Indiana taxpayers are not allowed adjustments to personal property assessments for normal obsolescence.

> "Normal obsolescence" means the anticipated or expected reduction in the value of business personal property that can be foreseen by a reasonable, prudent businessman when property is acquired and placed into service. In general, it includes the expected, declining value through use, gradual decline in value because of expected technological improvements, the gradual deterioration or obsolescence through the mere passage of time, and the general assumption that such property will have a minimum value at the end of its useful life.

50 I.A.C. 4.2-9-2

Indiana taxpayers are, however, allowed adjustments to personal property assessments for abnormal obsolescence.

    (a)    "Abnormal obsolescence" means that obsolescence which occurs as a result of factors over which the taxpayer has no control and is *unanticipated, unexpected, and cannot reasonably be foreseen* by a prudent businessman prior to the occurrence. It is of a *nonrecurring nature* and includes unforeseen changes in market values, exceptional technological obsolescence, or destruction by catastrophe that has a direct effect upon the value of the personal property of the taxpayer at the tax situs in question on a going concern basis.

    (b)    An example of unforeseen change in market value is a government ban on the sale of a drug or chemical due to a new discovery or determination may cause that item or the production equipment used to produce it to be abnormally obsolete. A specific example of this would be cyclamate. In this case the equipment used to produce it may be eligible for abnormal obsolescence.

    (c)    . . . [A]bnormal obsolescence due to exceptional technological obsolescence should be recognized to the extent that it causes the subject property to be incapable of use for current production or adaption to a different use. The invention of a newer, more productive piece of equipment which would produce a better quality item or utilization of state of the art technology that produces more efficiently at a lower cost of production does not cause an older, currently used asset to be considered abnormally obsolete. *If the asset is still capable of performing the function for which it was acquired, and is producing both on and before the assessment date, no adjustment shall be allowed.* The use of historical cost, short useful life, and accelerated

> depreciation in developing the prescribed true tax value percentages result in an equitable assessment on the property in question.

50 I.A.C. 4.2-9-3 (emphases added).  Abnormal obsolescence "includes the impairment of desirability and usefulness brought about by new inventions and improved processes for production, or the impairment of functional capacity or efficiency if the inadequacy or overadequacy causes a loss in value and has made the property incapable of continued use for a prolonged period during the assessment year." 50 I.A.C. 4.2-4-8(a).  The term "abnormal obsolescence" must be strictly construed and "limited to a situation where unforeseen changes in market values, exceptional technological obsolescence, or destruction by catastrophe occurs, providing that such events have a direct effect upon the valuation of the depreciable personal property of the taxpayer . . . ." 50 I.A.C. 4.2-4-8(c).

[20] Abnormal obsolescence "should be recognized to the extent that the property qualifies for the adjustment and the taxpayer is able to substantiate the facts, circumstances, and amount of the claim in order to properly determine the true tax value of the subject property." 50 I.A.C. 4.2-9-4.  If a taxpayer substantiates a claim for abnormal obsolescence, an adjustment "will be allowed." 50 I.A.C. 4.2-9-6.

## B.  The Printing Press

[21] Evansville Courier contends that the Board erred by concluding that Evansville Courier failed to establish the abnormal obsolescence of the Printing Press and

its related equipment. As noted above, the Board based this conclusion on two primary factors: (1) Evansville Courier "failed to point to a single, specific, non-recurring triggering event," such as 9/11, justifying a determination of abnormal obsolescence; and (2) the Printing Press is still operable and has five years remaining of predicted useful service life. Appellant's App. p. 106.

[22] There are two possible ways in which the Printing Press could qualify for an abnormal obsolescence adjustment: unforeseen changes in market values or exceptional technological obsolescence. Turning first to the latter, the Administrative Code requires that to make a successful claim of exceptional technological obsolescence, the personal property at issue must not be "still capable of performing the function for which it was acquired" and must not still be "producing both on and before the assessment date[.]" 50 I.A.C. 4.2-9-3(c). Here, it is undisputed that the Printing Press was still capable of performing the function for which it was acquired, was still producing output both on and before the assessment dates, and still had at least five years left of continuing functionality. Appellant's App. p. 106 (noting that Venisnik's own testimony established that there were "five years remaining of predicted useful service life" and that the Printing Press "continues to perform the purpose for which it was purchased twenty-five years ago"). Consequently, the plain terms of the Indiana Administrative Code mandate that Evansville Courier is not entitled to an abnormal obsolescence adjustment for the reason of exceptional technological obsolescence, and the Board did not err in so holding.

[23] The other possible way in which Evansville Courier could establish abnormal obsolescence was to show unforeseen changes in market values of the personal property at issue. The example of unforeseen changes in market values provided in the Indiana Administrative Code is the case of a pharmaceutical manufacturer that produces a drug that is suddenly banned in the United States, rendering the company's equipment used to produce that drug abnormally obsolescent. 50 I.A.C. 4.2-9-3(b). The examples provided by the Board in the instant case involved two corporate entities that suffered a substantial decline in business following the 9/11 terrorist attacks. Appellant's App. p. 106.

[24] Evansville Courier directs our attention to the evidence in the record tending to show a dramatic decline in the printed newspaper industry over the past decade. According to Evansville Courier, this precipitous drop in subscribers and circulation is directly linked to new technology and inventions, including smartphones, high speed internet, and social media such as Facebook and Twitter. Additionally, newspapers compete with 24-hour news coverage on cable news networks and also compete for classified advertising dollars with online services such as Craigslist.

[25] As noted above, to qualify as abnormally obsolescent, the obsolescence must be unanticipated, unexpected, unforeseen, and non-recurring. Even if the Court agrees solely for argument's sake that the dramatic change in the newspaper industry over the past decade has been unanticipated, unexpected, and unforeseen, it is far more difficult to conclude that it is "non-recurring." That term is not defined in the Indiana Administrative Code. *Merriam-Webster*

*Dictionary* defines "nonrecurring" as follows: "nonrecurrent; specifically: unlikely to happen again—used of financial transactions that affect a profit and loss statement abnormally." *Merriam-Webster Dictionary*, at https://www.merriam-webster.com/dictionary/non-recurring (last visited June 1, 2017). "Nonrecurrent," in turn, is defined as "not recurring," and "recur" is defined in relevant part as "to occur again after an interval: occur time after time." *Merriam-Webster Dictionary*, at https://www.merriam-webster.com/dictionary/recurring (last visited June 1, 2017). In other words, something that is "non-recurring" is a unique event that is unlikely to occur again.

[26]     In our view, an ongoing downward trend of an industry that has been occurring slowly over the course of a decade, and is still happening, cannot logically be defined as "non-recurring." It is more properly called "ongoing," or "currently occurring."

[27]     We acknowledge the administrative rule regarding "adjustment for obsolescence," which states that abnormal obsolescence "includes the impairment of desirability and usefulness brought about by new inventions and improved processes for production." 50 I.A.C. 4.2-4-8(a). At first blush, it may seem that this language, which implies a possibility of gradualness, conflicts with the requirement that the obsolescence be non-recurring. On closer examination, however, the language can be reconciled.

[28] Initially, it is important to note that Rule 4-8 refers to the definition of abnormal obsolescence found in Rule 9-3, which includes the "non-recurring" requirement. *Id.* Furthermore, Rule 4-8 requires that the term "abnormal obsolescence" be strictly construed. *Id.* at -8(c). Finally, the Court believes that an impairment of desirability and usefulness brought about by new inventions and improved processes can, in fact, result from a non-recurring event and be of a non-recurring nature. The invention of the VHS videocassette system would be such an event from the perspective of companies manufacturing Betamax systems. The invention of MP3 players would be such an event from the perspective of companies manufacturing compact discs and compact disc players. There are undoubtedly countless other examples of industries facing a dramatic drop in the value of personal property because of a single new invention or a single new process development.

[29] Here, unfortunately for Evansville Courier and the other struggling newspapers around the country, a whole host of events, inventions, and developments have taken place to cause the gradual decline of the industry. As noted above, among other things, we can look to high speed internet, smartphones, 24-hour television news, Facebook, Twitter, internet-only news providers such as Buzzfeed, etc. There is no one, non-recurring event on which blame can be placed. Under these circumstances, Evansville Courier has not established that the obsolescence of its property is non-recurring in nature. Therefore, the Board did not err by finding that Evansville Courier has not met its burden of establishing a prima facie case or by denying its petitions.

The judgment of the Board is affirmed.

SO ORDERED this 5th day of June 2017.

_____
John G. Baker, Special Judge
Indiana Tax Court

DISTRIBUTION:

Joshua C. Neal, William A. Ramsey, Winston Lin, and Jessica R. Gastineau